IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| GEORGIA STATE CONFERENCE OF THE NAACP, *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>MERIWETHER COUNTY BOARD OF ELECTIONS AND REGISTRATION, *et al.*,<br><br>*Defendants.* | CIVIL ACTION<br><br>FILE NO. 3:25-cv-00222-LMM |

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

## INTRODUCTION

Meriwether County's commission map had one majority-Black district in 2011 and still has one today. That majority-Black district was not electing a Black or Black-preferred candidate before or after the plan was redrawn in 2022. Plaintiffs' principal problem is that they lost an election in a district that is *less* than majority-Black and so now believe the law entitles them to *two* majority-Black districts, but that is not correct under the Voting Rights Act.

First, Plaintiffs cannot maintain this action as private parties. While the Attorney General can bring cases under Section 2, the U.S. Supreme Court has only ever assumed without deciding that private parties can bring Section 2

cases. The text of Section 2 does not support its use by private parties and this Court should dismiss this case on that basis alone.

Second, Plaintiffs waited to bring this lawsuit, so their claims are barred by laches. For more than a decade, Plaintiffs did not challenge the prior iterations of the map where a single majority-Black district was also not electing a Black or Black-preferred candidate, and they did not challenge the 2022 plan until almost a year after the 2024 elections. The current configuration, like the prior configuration dating back to 2011, contains one majority-Black district and that majority-Black district will only be up for one more election before a new map is drawn following the 2030 Census. Accordingly, the time for a plaintiff to challenge the map on the grounds of racial vote dilution has long since passed, and this Court should decline to disrupt the configuration at this late hour solely because a candidate is upset about losing an election.

## FACTUAL BACKGROUND

Meriwether County has a population of approximately 16,500 people of voting age, of which 35% are Black according to the 2020 Census. [Doc. 26 at ¶ 21]. Unlike other areas of the state where the relative Black population increased, this is a decrease from the 2010 Census, when 37% of the voting-age population in the county was Black. *Id.* at ¶ 22.

According to Plaintiffs, Meriwether's prior redistricting plan from 2011 had one majority-Black district (District 2) that was not electing a Black Commissioner and one non-majority-Black district (District 1) that was. [Doc. 26 at ¶¶ 59–60]. During the 2021 redistricting process, there was a political dispute about the best plan for County Commission. *Id.* at ¶¶ 35–45. Of the two plans submitted, both had only one majority-Black district and the legislature chose a plan that maintained one majority-Black district. *Id.* at ¶¶ 32–52. In the 2011 plan, District 2 was 50.2% Black voting age population and on the 2021 plan, it was 50.1% Black voting age population. *Id.* at ¶ 60. The Governor signed that plan in early 2022. *Id.* at ¶ 54.

Turning to the specific districts, District 1 previously had a Black voting age population of 44.4% in the 2011 plan and was the only district electing a Black candidate. *Id.* at ¶ 59. In the 2022 election, the Black candidate in District 1 was defeated by a white candidate. *Id.*

Two years later, Plaintiff Clements ran for District 2. *Id.* at ¶ 60. In the most recent election in District 2 on the 2011 plan before it was redrawn, the white candidate defeated the Black opponent. *Id.* Like the prior Black candidate in 2020, Plaintiff Clements was also unsuccessful in District 2, obtaining 49.7% of the vote, but short of a majority. *Id.*

Plaintiff Clements, joined by Plaintiff Bray and the Ga. State Conference of the NAACP, then waited almost another year before filing this lawsuit,

seeking to force the County to move to a new redistricting plan with two majority-Black seats. *Id.* at ¶ 66. That would mean Black voters would represent a majority of the voting age population in two of the five districts, or 40% of the districts in a county that is 35% Black voting-age population.

## ARGUMENT AND CITATION OF AUTHORITY

When considering motions to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) attacking the sufficiency of the allegations of the complaint, a court need not look beyond the complaint and all the allegations contained therein "are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990) (internal citations omitted). And "[o]nce a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." *Univ. of S. Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).

Similarly, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). While this Court must assume the veracity of well-pleaded factual allegations, it is not required to accept legal conclusions when they are "couched as [] factual allegation[s]." *Id.* at 678–79.

In the redistricting arena, courts "must be wary of plaintiffs who seek to transform federal courts into 'weapons of political warfare' that will deliver victories that eluded them 'in the political arena.'" *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024) (quoting *Cooper v. Harris*, 581 U.S. 285, 335 (2017) (Alito, J., concurring in judgment in part and dissenting in part)). As Plaintiffs' Complaint makes clear, this case originated with a political dispute over the best plan for County Commission. This Court should thus "be wary" based on what Plaintiffs allege in their Complaint.

## I.  This Court lacks subject matter jurisdiction.

Plaintiffs allege they are residents of Meriwether County and registered voters or acting on behalf of those voters. [Doc. 26 at ¶¶ 15–17]. And they seek to invoke this Court's jurisdiction under 42 U.S.C. § 1983 and the VRA, specifically 52 U.S.C. § 10308(f). *Id.* at ¶ 11. But neither provides an avenue for private parties to sue over potential violations of § 2.

### A.  There is no private right of action to enforce § 2.

Courts have frequently assumed a private right to enforce § 2, but it remains an "open question," because the Supreme Court has not decided that such a right exists. *Brnovich v. Democratic National Committee*, 594 U.S. 647, 689 (2021) (Gorsuch, J., concurring). The Eighth Circuit, in the only thoroughly reasoned circuit court opinion on the issue, decided there was none. *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023).

There, the court found that § 2 provides no express cause of action for private plaintiffs, and that the text and structure of the VRA make it clear that Congress did not intend to implicitly create one. *Id.* at 1206–07. And courts may not judicially "create one, no matter how desirable that might be as a policy matter." *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). Instead, "[l]ike substantive federal law itself, private rights of action to enforce federal law must be created by Congress." *Id.* at 286 (citation omitted). To determine whether Plaintiffs have a cause of action, courts must look to "the statute Congress has passed." *Id.* And as with all statutory interpretation, text and structure are key. *Id.* at 288. But at bottom, there are two overarching reasons why federal courts must exercise restraint in crafting implied private rights of action notwithstanding the lengthy practice of assuming such a right with respect to § 2.[1]

> 1. *Statutory construction principles demonstrate a lack of a private right of action.*

The first reason relies on statutory construction principles. It is an "elemental canon" of statutory interpretation that "where a statute expressly

---

[1] Other courts in this district have reached the opposite conclusion, but those opinions are also only persuasive authority. *See Alpha Phi Alpha Fraternity Inc. v. Raffensperger*, 700 F. Supp. 3d 1136, 1251 (N.D. Ga. 2023); *Georgia State Conf. of NAACP v. State*, 269 F. Supp. 3d 1266, 1274–75 (N.D. Ga. 2017) (three-judge court). *But see Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1351 (N.D. Ga. 2023) (finding no private right of action under Section 11 of the VRA).

provides a remedy, courts should be 'reluctant' to imply anything else." *Ark. State Conf. NAACP*, 86 F.4th at 1210 (quoting *Karahalios v. Nat'l Fed'n of Fed. Emps., Loc. 1263,* 489 U.S 527, 533 (1989)) (cleaned up). In other words, "[t]he express provision of one method of enforcing a substantive rule suggests Congress intended to preclude others." *Sandoval,* 532 U.S. at 290. And it is not the role of federal courts to imply a private right of action into an expansive enforcement scheme like that set forth in the VRA when Congress could have easily done so itself. "Atextual judicial supplementation is particularly inappropriate when… Congress has shown that it knows how to adopt the omitted language or provision." *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) (quoting *Rotkiske v. Klemm,* 589 U.S. 8, 14 (2019)).

        2.    *Federal courts cannot imply a private right of action.*

The second reason is more fundamental: federal courts simply lack the authority to imply a private right of action when the remedial scheme has already been clearly set forth by Congress. "Raising up causes of action where a statute has not created them may be a proper function of common-law courts, but not for federal tribunals." *Sandoval,* 532 U.S. at 287 (quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 365 (1991) (Scalia, J., concurring in part and concurring in judgment)). Thus, even if this Court felt that including a private right of action was wise as a policy matter, it is constrained by its limited grant of authority under Article III. Turning to the

7

VRA, a close examination of its structure evinces a scheme deliberately devoid of a private right of action to enforce § 2.

First, § 2 itself contains no express cause of action. *See Morse v. Republican Party of Va.*, 517 U.S. 186, 232 (1996) (plurality); 52 U.S.C. § 10301. In a bygone era, federal courts would liberally read causes of action into statutes to effectuate the courts' loose view of "congressional purpose." *J.I. Case Co. v. Borak*, 377 U.S. 426, 433 (1964). But the Supreme Court has long since "sworn off the habit…" *Sandoval*, 532 U.S. at 287; *see also Egbert v. Boule*, 596 U.S. 482, 491 (2022) (repudiating "the heady days in which [the Supreme] Court assumed common-law powers to create causes of action" (quotation omitted)). "[C]reating a cause of action is a legislative endeavor," requiring a careful cost-benefit analysis for which courts are ill-equipped. *Egbert*, 596 U.S. at 491.

Further, the textual evidence here shows that Congress repeatedly avoided creating a private cause of action to enforce § 2 despite having multiple opportunities to do so. Instead, in § 12 of the Act, Congress expressly empowered the Attorney General to enforce § 2 and numerous other provisions through criminal and civil actions. 52 U.S.C. § 10308(d). But § 12, like § 2, says nothing about private plaintiffs or private remedies. And that omission is critical. Because as already noted, it is a well-established maxim of statutory interpretation that "[t]he express provision of one [cause of action] suggests

8

that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. And the Supreme Court has instructed that it ultimately "Congress's job to *craft* policy and ours to *interpret* the words that codify it." *Lackey*, 604 U.S. at 205 (emphasis added).

In the specific context of considering whether a private right of action exists for a particular statutory claim, the inclusion of another cause of action in the statutory scheme is entitled to such great weight that it may "preclude[]" a "private right of action, even though other aspects of the statute ... suggest the contrary." *Sandoval,* 532 U.S. at 290 (citation omitted). That is because "the interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action." *Id.* at 288 n. 7 (cleaned up). The VRA is a multi-pronged statute with a detailed enforcement process. *See* 52 U.S.C. §§ 10302, 10308, 10310. When Congress, in such a "comprehensive legislative scheme," opts to specify *public* enforcement, the only permissible inference is that the *private* remedy was "deliberately omitted." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) (quotation omitted). And it is not the role of federal courts to imply a private right of action into such an expansive enforcement scheme when Congress could have easily done so itself. *See*, *e.g.*, *Lackey,* 604 U.S. at 205.

Indeed, "[i]f the 1965 Congress 'clearly intended' to create a private right of action, then why not say so in the statute? If not then, why not later, when

9

Congress amended § 2?" *Ark. State Conf. NAACP*, 86 F.4th at 1214. The readily apparent reason is that Congress vested enforcement power in the Attorney General instead of private parties—power the Attorney General has not exercised in this case. Without a private right of action, this Court lacks jurisdiction to hear Plaintiffs' claim and their Complaint should be dismissed in its entirety.

B. **Section 1983 does not save Plaintiffs' claim.**

Plaintiffs have another plan if there is no private right of action under the VRA, because they include 42 U.S.C. § 1983 as a basis for their claims. [Doc. 26 at ¶ 11]. While the Eighth Circuit did not consider the inclusion of a § 1983 claim when it evaluated the lack of a private right of action, *Ark. State Conf. NAACP*, 86 F.4th at 1218, it later did so, concluding for many of the same reasons that there was no basis to enforce § 2 through § 1983. *Turtle Mountain Band of Chippewa Indians v. Howe*, 137 F.4th 710, 721 (8th Cir. 2025) (petition for certiorari pending) (*Turtle Mountain*). Those same reasons hold true here.

In order "to sustain a § 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." *City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 120 (2005). As discussed above, there is no individually enforceable right under the VRA that Plaintiffs can exercise.

When considering this question, the Eighth Circuit began and ended its analysis with the first step of the Supreme Court's two-step test "for determining whether a cause of action exists under § 1983," which requires courts to first "determine whether Congress intended to create 'new rights enforceable under §1983.'" *Turtle Mountain*, 137 F.4th at 717 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002)). Referring to its prior ruling in *Ark. State Conf. NAACP*, 86 F.4th at 1209–10, the court explained that the determination of whether a "statutory violation may be enforced through § 1983" begins—like the question of a private right of action—with deciding "whether Congress *intended to create a federal right*." *Turtle Mountain*, 137 F.4th at 717 (emphasis original).

So, while Section 2 plaintiffs can be "within the general zone of interest that the statute is intended to protect," they cannot enforce § 2 through § 1983 "[b]ecause § 2 does not unambiguously confer an individual right." *Id.* at 721. This is because "[a] statute unambiguously confers an individual right when it is phrased 'with *unmistakable focus* on the benefited class.'" *Id.* at 717 (quoting *Gonzaga Univ.*, 536 U.S. at 284) (emphasis original). When Congress created § 2, it focused both on the individuals protected and the entities regulated, meaning it did not speak "with a 'clear voice' that manifests an 'unambiguous' intent to confer individual rights." *Id.* at 719 (quoting *Gonzaga Univ.*, 536 U.S. at 280). And "nothing short of an 'unambiguously' conferred individual right []

11

support[s] a cause of action brought under § 1983." *Id.* at 717 (quoting *Gonzaga Univ.*, 536 U.S. at 283). As a result, § 2 is not enforceable through § 1983 because it fails the first step. *Id.* at 718.

The Eighth Circuit's analysis applies equally to Defendants' motion to dismiss here. In this case, Plaintiffs are private parties seeking to assert a § 2 vote-dilution claim through 42 U.S.C. § 1983. [Doc. 26 at ¶ 11]. But because there is no private right of action and because § 2 does not unambiguously confer an individual right, Plaintiffs cannot "maintain a private right of action for alleged violations of § 2 through 42 U.S.C. § 1983." *Turtle Mountain,* 137 F.4th at 713.

Further, even if Congress did intend to confer an individual right, it can still foreclose the use of § 1983 either in the statutory text or "impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing v. Freestone*, 520 U.S. 329, 341 (1997). As discussed above, the VRA contains just such a comprehensive enforcement process through the Attorney General. *See* Section I.A. *above*; 52 U.S.C. §§ 10302, 10308, 10310. As a result, by not creating a private right of action, "Congress did not intend" for the VRA to be enforced through § 1983. *City of Rancho Palos Verdes*, 544 U.S. at 121; *Sandoval*, 532 U.S. at 290 ("[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").

12

Because of the comprehensive scheme created by the statute to be enforced by the Attorney General—power she specifically chose not to use in this case—Plaintiffs cannot assert a claim under § 2 of the VRA through § 1983. *Turtle Mountain*, 137 F.4th at 719.

## II. Plaintiffs' claims are barred by laches.

Plaintiffs have also delayed bringing this case for so long that any relief granted here is necessarily limited to just one more election before the next Census. That means their claims are barred by laches.

The doctrine of laches involves three elements: "(1) [A] delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Venus Lines Agency Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1230 (11th Cir. 2000). "[R]edistricting challenges are subject to the doctrine of laches because of the ten-year expiration date of electoral districts." *Sanders v. Dooly Cty.*, 245 F.3d 1289, 1290-1291 (11th Cir. 2001). Electoral districts must be redrawn every ten years because governments must ensure equal population representation upon the release of new Census data. *See Reynolds v. Sims*, 377 U.S. 533 (1964).

The redistricting plan Plaintiffs challenge was adopted in 2022 and maintained the same mixture of demographics as the 2011 plan: one majority-Black district and four non-majority-Black districts. [Doc. 26 at ¶ 37]. Plaintiffs did not sue when the plan was adopted, nor did they sue when a Black candidate

13

was defeated in 2022. Instead, they waited until the fall of 2025 to challenge the plan at issue—when by their own allegations only a single election remains for the sole majority-Black district in 2028 before the plan will have to be redrawn at the next Census.

Considering the ten-year life-cycle of district plans, declining to bring a ripe claim for years represents a substantial delay and satisfies the first element of laches. *See, e.g., Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (affirming denial of preliminary injunction when plaintiffs did not exercise reasonable diligence in bringing claims against congressional plan); *Chestnut v. Merrill*, 377 F. Supp. 3d 1308, 1317 (N.D. Ala. 2019) (group of plaintiffs waiting until 2018 to bring a claim under the Voting Rights Act regarding a congressional map implemented in 2011 represented delay for the purposes of laches analysis). Delay is measured "from the time at which the plaintiff knows or should know she has a provable claim." *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F. 3d 1199, 1203 (11th Cir. 1997). The demographic makeup of the plan they challenge now (one majority-Black district and four non-majority-Black districts) is the same as the plan that existed since 2011—and they only filed this case when the 2026 election cycle was nearly underway, limiting any potential relief in District 2 to one election (the 2028 election) only. *Chestnut*, 377 F. Supp. 3d at 1315.

Further, the delay by Plaintiffs was not excusable. Each Plaintiff admits being longtime voters and participating in elections, and the Ga. NAACP has a

14

long history of litigating involving elections. [Doc. 26 at ¶¶ 15–17]. *See Chestnut*, 377 F. Supp. 3d at 1316. Plaintiffs admit they were aware that the only Black commissioner in the county lost the election in 2022, but still waited until after Plaintiff Clements lost the election before filing this case.

Finally, the delay prejudices Defendants. If Plaintiffs prevail, there is only one election cycle left for District 2 of the County Commission before the next Census. *Chestnut*, 377 F. Supp. 3d at 1316–17. Plaintiffs have placed Defendants in a position of having to defend a state-chosen plan at a significant cost. Plaintiffs' delay will cause Defendants to incur serious defense costs in addition to the possibility of requiring the significant costs associated with redrawing maps for a single election cycle.

Plaintiffs have inexplicably delayed this process by waiting until late 2025 to bring claims that were perfectly capable of being brought by all of them as early as 2011 or even 2022. Such an order would create "instability and dislocation in the electoral system," and impose "great financial and logistical burdens" on the state. *White v. Daniel*, 909 F.2d 99, 104 (4th Cir. 1990). Moreover, these burdens and instability are directly attributable to the conscious delay occasioned by Plaintiffs in waiting to bring this case. Put differently, "[t]his prejudice was caused by Plaintiffs' inexcusable delay in waiting until 20[25] to file suit." *Chestnut*, 377 F. Supp. 3d at 1317. As a result, this Court should find that "the doctrine of laches bars Plaintiffs' claim" for injunctive relief. *Id*.

## CONCLUSION

This case was brought late and by the wrong parties. Private parties cannot bring challenges under Section 2 of the VRA and, even if they can, the delay in this case demonstrates why this Court should refuse to hear it.

Respectfully submitted this 20th day of November, 2025.

> */s/ Bryan P. Tyson*
> Bryan P. Tyson
> Georgia Bar No. 515411
> btyson@clarkhill.com
> Bryan F. Jacoutot
> Georgia Bar No. 668272
> bjacoutot@clarkhill.com
> Diane Festin LaRoss
> Georgia Bar No. 430830
> dlaross@clarkhill.com
> **Clark Hill PLC**
> 3630 Peachtree Road NE
> Suite 700
> Atlanta, Georgia 30326
> 678.370.4377 (phone)
>
> *Counsel for County Defendants*

## CERTIFICATE OF COMPLIANCE

Under L.R. 7.1(D), the undersigned hereby certifies that the foregoing has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(C).

*/s/ Bryan P. Tyson*
Bryan P. Tyson